Justice White,
with whom
Justice Stevens joins, and with whom Justice Souter joins as to Part I, concurring in the judgment in part and dissenting in part.
I am convinced that the Double Jeopardy Clause bars prosecution for an offense if the defendant already has been held in contempt for its commission. Therefore, I agree with the Court’s conclusion that both Dixon’s prosecution for possession with intent to distribute cocaine and Foster’s prosecution for simple assault were prohibited. In my view, however, Justice Scalia’s opinion gives short shrift to the arguments raised by the United States. I also am uncomfortable with the reasoning underlying this holding, in particular the application of Blockburger v. United States, 284 U. S. 299 (1932), to the facts of this case, a reasoning that betrays an overly technical interpretation of the Constitution. As a result, I concur only in the judgment in Part III-A.
The mischief in the Court’s approach is far more apparent in the second portion of today’s decision. Constrained by its narrow reading of the Double Jeopardy Clause, it asserts that the fate of Foster’s remaining counts depends on Grady v. Corbin, 495 U. S. 508 (1990), which the Court then chooses *723 to overrule. Ante, at 704. I do not agree. Resolution of the question presented by Foster’s case no more requires reliance on Grady than it points to reasons for reversing that decision. Rather, as I construe the Clause, double jeopardy principles compel equal treatment of all of Foster’s counts. I dissent from the Court’s holding to the contrary. Inasmuch as Grady has been dragged into this case, however, I agree with Justice Blackmun and Justice Souter that it should not be overruled. Post, at 741, 744. From this aspect of the Court’s opinion as well, I dissent.
I
The chief issue before us is whether the Double Jeopardy Clause applies at all to cases such as these. Justice & alia finds that it applies, but does so in conclusory fashion, without dealing adequately with either the Government’s arguments or the practical consequences of today’s decision. Both, in my view, are worthy of more.
A
The position of the United States is that, for the purpose of applying the Double Jeopardy Clause, a charge of criminal contempt for engaging in conduct that is proscribed by court order and that is in turn forbidden by the criminal code is an offense separate from the statutory crime. The United States begins by pointing to prior decisions of this Court to support its view. Heavy reliance is placed on In re Debs, 158 U. S. 564 (1895), but, as the majority notes, see ante, at 699, the relevant portion of the opinion is dictum — and seriously weakened dictum at that. See Bloom v. Illinois, 391 U. S. 194 (1968).
The Government also relies on two cases involving Congress’ power to punish by contempt a witness who refuses to testify before it, In re Chapman, 166 U. S. 661 (1897), and Jurney v. MacCracken, 294 U. S. 125 (1935). Both cases appear to lean in the Government’s direction, but neither is conclu *724 sive. First, the statements were dicta. The claim in Jurney and Chapman was that the power to punish for contempt and the power to punish for commission of the statutory offense could not coexist side by side. But in neither were both powers exercised; in neither case did the defendant face a realistic threat of twice being put in jeopardy. In fact, as the majority notes, ante, at 698-699, n. 2, the Court expressed doubt that consecutive prosecutions would be brought in such circumstances. See Chapman, supra, at 672.
Second, both decisions concern the power to deal with acts interfering directly with the performance of legislative functions, a power to which not all constitutional restraints on the exercise of judiciary authority apply. See Marshall v. Gordon, 243 U. S. 521, 547 (1917). The point, spelled out in Marshall, is this: In a case such as Chapman, where the contempt proceeding need not “resor[t] to the modes of trial required by constitutional limitations ... for substantive offenses under the criminal law,” 243 U. S., at 543, so too will it escape the prohibitions of the Double Jeopardy Clause. If, however, it is of such a character as to be subject to these constitutional restrictions, “those things which, as pointed out in In re Chapman . . . , were distinct and did not therefore the one frustrate the other — the implied legislative authority to compel the giving of testimony and the right criminally to punish for failure to do so — would become one and the same and the exercise of one would therefore be the exertion of, and the exhausting of the right to resort to, the other.” Id., at 547.
Marshall thus suggests that application of the Double Jeopardy Clause, like that of other constitutional guarantees, is a function of the type of contempt proceeding at issue. Chapman, it follows, cannot be said to control this case. Rather, whatever application Chapman (and, by implication, Jurney) might have in the context of judicial contempt is limited to cases of in-court contempts that constitute direct obstructions of the judicial process and for which summary *725 proceedings remain acceptable. Cf. Marshall, supra, at 543. Neither Dixon nor Foster is such a case.[1]
The United States’ second, more powerful, argument is that contempt and the underlying substantive crime constitute two separate offenses for they involve injuries to two distinct interests, the one the interest of the court in preserving its authority, the other the public’s interest in being protected from harmful conduct. This position finds support in Justice Blackmun’s partial dissent, see post, at 743, and is bolstered by reference to numerous decisions acknowledging the importance and role of the courts’ contempt power. See, e. g., Young v. United States ex rel. Vuitton et Fils S. A., 481 U. S. 787, 800 (1987); Michaelson v. United States ex rel. Chicago, St. P., M. & O. R. Co., 266 U. S. 42, 65 (1924); Gompers v. Bucks Stove & Range Co., 221 U. S. 418, 450 (1911). It cannot lightly be dismissed. Indeed, we recognized in Young, supra, that contempt “proceedings are not intended to punish conduct proscribed as harmful by the general criminal laws. Rather, they are designed to serve the limited purpose of vindicating the authority of the court. In punishing contempt, the Judiciary is sanctioning conduct that *726 violates specific duties imposed by the court itself, arising directly from the parties’ participation in judicial proceedings.” Id., at 800.
The fact that two criminal prohibitions promote different interests may be indicative of legislative intent and, to that extent, important in deciding whether cumulative punishments imposed in a single prosecution violate the Double Jeopardy Clause. See Missouri v. Hunter, 459 U. S. 359, 366-368 (1983). But the cases decided today involve instances of successive prosecutions in which the interests of the defendant are of paramount concern. To subject an individual to repeated prosecutions exposes him to “embarrassment, expense and ordeal,” Green v. United States, 355 U. S. 184, 187 (1957), violates principles of finality, United States v. Wilson, 420 U. S. 332, 343 (1975), and increases the risk of a mistaken conviction. That one of the punishments is designed to protect the court rather than the public is, in this regard, of scant comfort to the defendant.[2]
It is true that the Court has not always given primacy to the defendant’s interest. In particular, the Government directs attention to the dual sovereignty doctrine under which, “[w]hen a defendant in a single act violates the ‘peace *727 and dignity’ of two sovereigns by breaking the laws of each, he has committed two distinct ‘offences.’” Heath v. Alabama, 474 U. S. 82, 88 (1985) (quoting United States v. Lanza, 260 U.S. 377, 382 (1922)). See also United States v. Wheeler, 435 U.S. 313, 317 (1978); Moore v. Illinois, 14 How. 13, 19 (1852).
But the dual sovereignty doctrine is limited, by its own terms, to cases where “the two entities that seek successively to prosecute a defendant for the same course of conduct can be termed separate sovereigns.” Heath, 474 U. S., at 88. “This determination,” we explained, “turns on whether the two entities draw their authority to punish the offender from distinct sources of power,” ibid., not on whether they are pursuing separate interests. Indeed, the Court has rejected the United States’ precise argument in the past, perhaps nowhere more resolutely than in Grafton v. United States, 206 U. S. 333 (1907). In that case, the defendant, a private in the United States Army stationed in the Philippines, was tried before a general court-martial for homicide. Subsequent to Grafton’s acquittal, the United States filed a criminal complaint in civil court based on the same acts. Seeking to discredit the view that the Double Jeopardy Clause would be violated by this subsequent prosecution, the Government asserted that “Grafton committed two distinct offenses — one against military law and discipline, the other against the civil law which may prescribe the punishment for crimes against organized society by whomsoever those crimes are committed.” Id., at 351. To which the Court responded:
“Congress, by express constitutional provision, has the power to prescribe rules for the government and regulation of the Army, but those rules must be interpreted in connection with the prohibition against a man’s being put twice in jeopardy for the same offense.... If, therefore, a person be tried for an offense in a tribunal deriv *728 ing its jurisdiction and authority from the United Státes and is acquitted or convicted, he cannot again be tried for the same offense in another tribunal deriving its jurisdiction and authority from the United States. . . . [T]he same acts constituting a crime against the United States cannot, after the acquittal or conviction of the accused in a court of competent jurisdiction, be made the basis of a second trial of the accused for that crime in the same or in another court, civil or military, of the same government. Congress has chosen, in its discretion, to confer upon general courts-martial authority to try an officer or soldier for any crime, not capital, committed by him in the territory in which he is serving. When that was done the judgment of such military court was placed upon the same level as the judgments of other tribunals when the inquiry arises whether an accused was, in virtue of that judgment, put in jeopardy of life or limb.” Id., at 352.
Grafton, and the principle it embodies, are controlling. The Superior Court and the District of Columbia Court of Appeals were created by Congress, pursuant to its power under Article I of the Constitution. See Palmore v. United States, 411 U. S. 389 (1973). In addition, the specific power exercised by the courts in this case were bestowed by the Legislature. See ante, at 691. As we observed in United States v. Providence Journal Co., 485 U. S. 693 (1988), “[t]he fact that the allegedly criminal conduct concerns a violation of a court order instead of common law or a statutory prohibition does not render the prosecution any less an exercise of the sovereign power of the United States.” Id., at 700. It is past dispute, in other words, that “the two tribunals that tried the accused exert all their powers under and by the authority of the same government — that of the United States,” Grafton, supra, at 355, and, therefore, that the dual *729 sovereignty doctrine poses no problem. Cf. Heath, supra, at 88.[3]
B
Both the Government and amici submit that application of the Double Jeopardy Clause in this context carries grave practical consequences. See also post, at 742-743 (Black-MUN, J., concurring in judgment in part and dissenting in part). It would, it is argued, cripple the power to enforce court orders or, alternatively, allow individuals to escape serious punishment for statutory criminal offenses. The argument, an offshoot of the principle of necessity familiar to the law of contempt, see, e. g., United States v. Wilson, 421 U. S. 309, 315-318 (1975), is that, just as we have relaxed certain procedural requirements in contempt proceedings where time is of the essence and an immediate remedy is needed to “prevent a breakdown of the proceedings,” id., at 319, so too should we exclude double jeopardy protections from this setting lest we do damage to the courts’ authority. In other words, “[t]he ability to punish disobedience to judicial orders [being] regarded as essential to ensuring that the Judiciary has a means to vindicate its own authority,” Young, 481 U. S., at 796, its exercise should not be inhibited by fear that it might immunize defendants from subsequent criminal prosecution.
Adherence to double jeopardy principles in this context, however, will not seriously deter the courts from taking appropriate steps to ensure that their authority is not flouted. *730 Courts remain free to hold transgressors in. contempt and punish them as they see fit. The Government counters that this possibility will prove to be either illusory — if the prosecuting authority declines to initiate proceedings out of fear that they could jeopardize more substantial punishment for the underlying crime — or too costly — if the prosecuting authority, the risk notwithstanding, chooses to go forward. But it is not fanciful to imagine that judges and prosecutors will select a third option, which is to ensure, where necessary or advisable, that the contempt and the substantive charge be tried at the same time, in which case the double jeopardy issue “would be limited to ensuring that the total punishment did not exceed that authorized by the legislature.” United States v. Halper, 490 U. S. 435, 450 (1989). Indeed, the Court recently exercised its supervisory power to suggest that a federal court “ordinarily should first request the appropriate prosecuting authority to prosecute contempt actions, and should appoint a private prosecutor only if that request is denied.” Young, 481 U. S., at 801. Just as “[i]n practice, courts can reasonably expect that the public prosecutor will accept the responsibility for prosecution,” ibid., so too can the public prosecutor reasonably anticipate that the court will agree to some delay if needed to bring the two actions together.
Against this backdrop, the appeal of the principle of necessity loses much of its force. Ultimately, the urgency of punishing such contempt violations is no less, but by the same token no more, than that of punishing violations of criminal laws of general application — in which case, we simply do not question the defendant’s right to the “protections worked out carefully over the years and deemed fundamental to our system of justice,” Bloom v. Illinois, 391 U. S., at 208, including the protection of the Double Jeopardy Clause. “Perhaps to some extent we sacrifice efficiency, expedition, and economy, but the choice ... has been made, and retained, in the Consti *731 tution. We see no sound reason in logic or policy not to apply it in the area of criminal contempt.” Id., at 209 [4]
Dixon aptly illustrates these points. In that case, the motion requesting modification of the conditions of Dixon’s release was filed by the Government, the same entity responsible for prosecution of the drug offense. Indeed, in so doing it relied explicitly on the defendant’s indictment on the cocaine charge. 598 A. 2d 724, 728 (D. C. 1991). Logically, any problem of coordination or of advance notice of the impending prosecution for the substantive offense was at most minimal. Nor, aside from the legitimate desire to punish all offenders swiftly, does there appear to have been any real need to hold Dixon in contempt immediately, without waiting for the second trial. By way of comparison, at the time of his drug offense Dixon was awaiting trial for second-degree murder, a charge that had been brought some 11 months earlier.
Besides, in the situation where a person has violated a condition of release, there generally exist a number of alternatives under which the defendant’s right against being put twice in jeopardy for the same offense could be safeguarded, while ensuring that disregard of the court’s authority not go unsanctioned. To the extent that they are exercised with due regard for the Constitution, such options might include modification of release conditions or revocation of bail and detention.[5] As respondents acknowledge, these solutions *732 would raise no double jeopardy problem. See Tr. of Oral Arg. 30.
More difficult to deal with are the circumstances surrounding Foster’s defiance of the court order. Realization of the scope of domestic violence — according to the American Medical Association (AMA), “the single largest cause of injury to women,” AMA, Five Issues in American Health 5 (1991)— has come with difficulty, and it has come late.
There no doubt are time delays in the operation of the criminal justice system that are frustrating; they even can be perilous when an individual is left exposed to a defendant’s potential violence. That is true in the domestic context; it is true elsewhere as well. Resort to more expedient methods therefore is appealing, and in many cases permissible. Under today’s decision, for instance, police officers retain the power to arrest for violation of a civil protection order. Where the offense so warrants, judges can haul the assailant before the court, charge him with criminal contempt, and hold him without bail. See United States v. Salerno, 481 U. S. 739 (1987); United States v. Edwards, 430 A. 2d 1321 (D. C. 1981). Also, cooperation between the government and parties bringing contempt proceedings can be achieved. The various actors might not have thought such cooperation necessary in the past; after today’s decision, I suspect they will.[6]
*733 Victims, understandably, would prefer to have access to a proceeding in which swift and expeditious punishment could be inflicted for that offense without prejudice to a subsequent full-blown criminal trial. The justification for such a system, however, has nothing to do with preventing disruption of a court’s proceedings or even with vindicating its authority. While, under the principle of necessity, contempt proceedings have been exempted from some constitutional constraints, this was done strictly “to secure judicial authority from obstruction in the performance of its duties to the end that means appropriate for the preservation and enforcement of the Constitution may be secured.” Ex parte Hudgings, 249 U. S. 378, 383 (1919). No such end being invoked here, the principle of necessity cannot be summoned for the sole purpose of letting contempt proceedings achieve what, under our Constitution, other criminal trials cannot.
II
If, as the Court agrees, the Double Jeopardy Clause cannot be ignored in this context, my view is that the subsequent prosecutions in both Dixon and Foster were impermissible as to all counts. I reach this conclusion because the offenses at issue in the contempt proceedings were either identical to, or lesser included offenses of, those charged in the subsequent prosecutions. Justice Scalia’s contrary conclusion as to some of Foster’s counts, which he reaches by exclusive focus on the formal elements of the relevant crimes, is divorced from the purposes of the constitutional provision he purports to apply. Moreover, the results to which this approach would lead are indefensible.
A
The contempt orders in Foster and Dixon referred in one case to the District’s laws regarding assaults and threats, and, in the other, to the criminal code in its entirety. The prohibitions imposed by the court orders, in other words, *734 duplicated those already in place by virtue of the criminal statutes. Aside from differences in the sanctions inflicted, the distinction between being punished for violation of the criminal laws and being punished for violation of the court orders, therefore, is simply this: Whereas in the former case “the entire population” is subject to prosecution, in the latter such authority extends only to “those particular persons whose legal obligations result from their earlier participation in proceedings before the court.” Young, 481 U. S., at 800, n. 10. But the offenses that are to be sanctioned in either proceeding must be similar, since the contempt orders incorporated, in full or in part, the criminal code.[7]
*735 Thus, in this case, the offense for which Dixon was held in contempt was possession with intent to distribute drugs. Since he previously had been indicted for precisely the same offense, the double jeopardy bar should apply. In Foster’s contempt proceeding, he was acquitted with respect to threats allegedly made on November 12, 1987, and March 26 and May 17, 1988. He was found in contempt of court for having committed the following offenses: Assaulting his wife on November 6, 1987, and May 21, 1988, and threatening her on September 17, 1987. 598 A. 2d, at 727; App. 42. The subsequent indictment charged Foster with simple assault on November 6,1987 (Count I); threatening to injure another on or about November 12, 1987, and March 26 and May 17, 1988 (Counts II, III, and IV); and assault with intent to kill on or about May 21, 1988 (Count V). All of the offenses for which Foster was either convicted or acquitted in the contempt proceeding were similar to, or lesser included offenses of, those charged in the subsequent indictment. Because “the Fifth Amendment forbids successive prosecution ... for a greater and lesser included offense,” Brown v. Ohio, 432 U. S. 161, 169 (1977); see also Grafton, 206 U. S., at 349-351, the second set of trials should be barred in their entirety.
B
Professing strict adherence to Blockburger’s so-called “same-elements” test, see Blockburger v. United States, 284 U. S. 299 (1932), Justice Scalia opts for a more circuitous approach. The elements of the crime of contempt, he reasons, in this instance are (1) the existence and knowledge of a court, or CPO; and (2) commission of the underlying substantive offense. See ante, at 701. Where the criminal conduct that forms the basis of the contempt order is identical to that charged in the subsequent trial, Justice Scalia *736 concludes, Blockburger forbids retrial. All elements of Foster’s simple assault offense being included in his previous contempt offense, prosecution on that ground is precluded. Ante, at 700. The same is true of Dixon’s drug offense. Ibid. I agree with this conclusion, though would reach it rather differently: Because in a successive prosecution case the risk is that a person will have to defend himself more than once against the same charge, I would have put to the side the CPO (which, as it were, triggered the court’s authority to punish the defendant for acts already punishable under the criminal laws) and compared the substantive offenses of which respondents stood accused in both prosecutions.[8]
The significance of our disaccord is far more manifest where an element is added to the second prosecution. Under Justice Scalia’s view, the double jeopardy barrier is then removed because each offense demands proof of an element the other does not: Foster’s conviction for contempt requires proof of the existence and knowledge of a CPO, which conviction for assault with intent to kill does not; his conviction for assault with intent to kill requires proof of an intent to kill, which the contempt conviction did not. Ante, at 701. Finally, though he was acquitted in the contempt proceedings with respect to the alleged November 12, March 26, and May 17 threats, his conviction under the threat charge in the subsequent trial required the additional proof that the threat be to kidnap, to inflict bodily injury, or to damage property. Ante, at 702. As to these counts, and absent any collateral-estoppel problem, see ante, at 712, *737 n. 17, Justice Scalia finds that the Constitution does not prohibit retrial.
The distinction drawn by Justice Scalia is predicated on a reading of the Double Jeopardy Clause that is abstracted from the purposes the constitutional provision is designed to promote. To focus on the statutory elements of a crime makes sense where cumulative punishment is at stake, for there the aim simply is to uncover legislative intent. The Blockburger inquiry, accordingly, serves as a means to determine this intent, as our cases have recognized. See Missouri v. Hunter, 459 U. S., at 368. But, as Justice Souter shows, adherence to legislative will has very little to do with the important interests advanced by double jeopardy safeguards against successive prosecutions. Post, at 744. The central purpose of the Double Jeopardy Clause being to protect against vexatious multiple prosecutions, see Hunter, supra, at 365; United States v. Wilson, 420 U. S., at 343, these interests go well beyond the prevention of unauthorized punishment. The same-elements test is an inadequate safeguard, for it leaves the constitutional guarantee at the mercy of a legislature’s decision to modify statutory definitions. Significantly, therefore, this Court has applied an inflexible version of the same-elements test only once, in 1911, in a successive prosecution case, see Gavieres v. United States, 220 U. S. 338 (1911), and has since noted that “[t]he Blockburger test is not the only standard for determining whether successive prosecutions impermissibly involve the same offense.” Brown, 432 U. S., at 166-167, n. 6. Rather, “[e]ven if two offenses are sufficiently different to permit the imposition of consecutive sentences, successive prosecutions will be barred in some circumstances where the second prosecution requires the relitigation of factual issues already resolved by the first.” Ibid.
Take the example of Count V in Foster: For all intents and purposes, the offense for which he was convicted in the contempt proceeding was his assault against his wife. The *738 majority, its eyes fixed on the rigid elements test, would have his fate turn on whether his subsequent prosecution charges “simple assault” or “assault with intent to kill.” Yet, because the crime of “simple assault” is included within the crime of “assault with intent to kill,” the reasons that bar retrial under the first hypothesis are equally present under the second: These include principles of finality, see United States v. Wilson, supra, at 343; protecting Foster from “embarrassment” and “expense,” Green v. United States, 355 U. S., at 187; and preventing the Government from gradually fine-tuning its strategy, thereby minimizing exposure to a mistaken conviction, id., at 188. See also Tibbs v. Florida, 457 U. S. 31, 41 (1982); Arizona v. Washington, 434 U. S. 497, 503-504 (1978); supra, at 724.
Analysis of the threat charges (Counts II-IV) makes the point more clearly still. In the contempt proceeding, it will be recalled, Foster was acquitted of the — arguably lesser included — offense of threatening “in any manner.” As we have stated:
“[T]he law attaches particular significance to an acquittal. To permit a second trial after an acquittal, however mistaken the acquittal might have been, would present an unacceptably high risk that the Government, with its vastly superior resources, might wear down the defendant so that ‘even though innocent he may be found guilty.’” United States v. Scott, 437 U. S. 82, 91 (1978) (citation omitted).
To allow the Government to proceed on the threat counts would present precisely the risk of erroneous conviction the Clause seeks to avoid. That the prosecution had to establish the existence of the CPO in the first trial, in short, does not in any way modify the prejudice potentially caused to a defendant by consecutive trials.
To respond, as the majority appears to do, that concerns relating to the defendant’s interests against repeat trials are *739 “unjustified” because prosecutors “have little to gain and much to lose” from bringing successive prosecutions and because “the Government must be deterred from abusive, repeated prosecutions of a single offender for similar offenses by the sheer press of other demands upon prosecutorial and judicial resources,” ante, at 710-711, n. 15, is to get things exactly backwards. The majority’s prophesies might be correct, and double jeopardy might be a problem that will simply take care of itself. Not so, however, according to the Constitution, whose firm prohibition against double jeopardy cannot be satisfied by wishful thinking.
C
Further consequences — at once illogical and harmful— flow from Justice Scalia’s approach.[9] I turn for illustration once more to Foster’s assault case. In his second prosecution, the Government brought charges of assault with intent to kill. In the District of Columbia, Superior Court Criminal Rule 31(c) — which faithfully mirrors its federal counterpart, Federal Rule of Criminal Procedure 31(c) — provides that a “defendant may be found guilty of an offense necessarily included in the offense charged or of an attempt to commit either the offense charged or an offense necessarily included therein if the attempt is an offense.” This provision has been construed to require the jury to determine guilt of all lesser included offenses. See Simmons v. United States, 554 A. 2d 1167 (D. C. 1989). Specifically, “[a] defendant is entitled to a lesser-included offense instruction when (1) all elements of the lesser offense are included within the offense charged, and (2) there is a sufficient evidentiary basis for the lesser charge.” Rease v. United States, 403 A. 2d 322, 328 (D. C. 1979) (citations omitted).
Simple assault being a lesser included offense of assault with intent to kill, cf. Keeble v. United States, 412 U. S. 205 *740 (1973), the jury in the second prosecution would in all likelihood receive instructions on the lesser offense and could find Foster guilty of simple assault. In short, while the Government cannot, under the Constitution, bring charges of simple assault, it apparently can, under the majority’s interpretation, secure a conviction for simple assault, so long as it prosecutes Foster for assault with intent to kill. As I see it, Foster will have been put in jeopardy twice for simple assault.[10] The result is as unjustifiable as it is pernicious. It *741 stems, I believe, from a “hypertechnical and archaic approach,” Ashe v. Swenson, 397 U. S. 436, 444 (1970).
“Archaic” might not quite be the word, for even as far back as 1907 the Court appeared to hold a more pragmatic view. Defendant’s court-martial in Grafton was authorized under the 62d Article of War, pursuant to which Congress granted military courts the power to try “officers and soldiers” in time of peace “for any offense, not capital, which the civil law declares to be a crime against the public.” 206 U. S., at 341-342, 348, 351. Grafton faced the following charge: “ Tn that Private Homer E. Grafton ... being a sentry on post, did unlawfully, willfully, and feloniously kill Florentino Castro, a Philippino ... [and] Felix Villanueva, a Philippino.’” Id., at 341. He was acquitted. Id., at 342. Some three months later, Grafton was prosecuted in a civil criminal court. He was charged with the crime of “assassination,” defined as a killing accompanied by any of the following: “(1) With treachery; (2) For price or promise of reward; (3) By means of flood, fire, or poison; (4) With deliberate premeditation; (5) With vindictiveness, by deliberately and inhumanly increasing the suffering of the person attacked.” Id., at 343. Grafton ultimately was found guilty of homicide, a lesser included offense. Id., at 344.
To convict Grafton in the first proceeding, then, it had to be established that (1) he was an officer or a soldier, and (2) he unlawfully killed. In the civil tribunal, the prosecution was required to prove (1) the killing, and (2) some further element, as specified. Had Grafton been tried in 1993 rather than 1907, I suppose that an inflexible Blockburger test, which asks whether “each provision requires proof of a fact the other does not,” 284 U. S., at 304, would uncover no double jeopardy problem. At the time, though, the Court looked at matters differently: Both trials being for the same killing, and “[t]he identity of the offenses [being] determined, *742 not by their grade, but by their nature,” id., at 350, prosecuting Grafton for assassination meant twice putting him in jeopardy for the same offense.
I would dispose of Foster’s case in like fashion, and focus on what Justice Scalia overlooks: The interests safeguarded by the Double Jeopardy Clause, and the fact that Foster should not have to defend himself twice against the same charges. When the case is so viewed, the condition that Foster be subject to a contempt order as a practical matter is analogous to the condition that Grafton be a soldier, for it triggered the court’s authority to punish offenses already prescribed by the criminal law. At that point, the relevant comparison for double jeopardy purposes should be between the offenses charged in the two proceedings.
Ill
Once it is agreed that the Double Jeopardy Clause applies in this context, the Clause, properly construed, both governs this case and disposes of the distinction between Foster’s charges upon which Justice Scalia relies. I therefore see little need to draw Grady into this dispute. In any event, the United States itself has not attempted to distinguish between Dixon and Foster or between the charges of “assault” on the one hand and, on the other, “assault with intent to kill” and “threat to injure another.” The issue was not raised before the Court of Appeals or considered by it, and it was neither presented in the petition for certiorari nor briefed by either party. Under these circumstances, it is injudicious to address this matter. See, e. g., Mazer v. Stein, 347 U. S. 201, 206, n. 5 (1954); Adickes v. S. H. Kress & Co., 398 U. S. 144, 147, n. 2 (1970).
The majority nonetheless has chosen to consider Grady anew and to overrule it. I agree with Justice Blackmun and Justice Souter that such a course is both unwarranted and unwise. See post, at 741, 744. Hence, I dissent from the judgment overruling Grady.
*743 IV
Believing that the Double Jeopardy Clause bars Foster’s and Dixon’s successive prosecutions on all counts, I would affirm the judgment of the District of Columbia Court of Appeals. I concur in the judgment of the Court in Part III-A, which holds that Dixon’s subsequent prosecution and Count I of Foster’s subsequent prosecution were barred. I disagree with Justice Scalia’s application of Blockburger in Part III-B. From Part IV of the opinion, in which the majority decides to overrule Grady, I dissent.

 The distinction between, on the one hand, direct and summary contempt (1 e., contempt for acts occurring in the courtroom and interfering with the orderly conduct of business), and, on the other, nonsummary contempt, possesses old roots in the Court’s cases. See United States v. Wilson, 421 U. S. 309 (1975); Cammer v. United States, 350 U. S. 399 (1956); Nye v. United States, 313 U. S. 33, 47-52 (1941); Cooke v. United States, 267 U. S. 517, 537 (1925); In re Savin, 131 U. S. 267 (1889); Ex parte Terry, 128 U. S. 289 (1888). See also Fed. Rule Crim. Proc. 42(a). Significantly, some courts have relied on this division to allow retrial on substantive criminal charges after a summary contempt proceeding based on the same conduct. See, e. g., United States v. Rollerson, 145 U. S. App. D. C. 338, 343, n. 13, 449 F. 2d 1000, 1005, n. 13 (1971); United States v. Mirra, 220 F. Supp. 361 (SDNY 1963). The argument goes as follows: Because summary proceedings do not really involve adversary proceedings, see Cooke, supra, they do not raise typical double jeopardy concerns and the defendant is not being subjected to successive trials. The instant cases deal exclusively with nonsummary contempt trials.

 It also is worth noting that sentences for contumacious conduct can be quite severe. Under federal law, there is no statutory limit to the sentence that can be imposed in a jury-tried criminal contempt proceeding. See 18 U. S. C. § 401. The same is true in the District of Columbia. See D. C. Code Ann. § 11-944 (Supp. 1992); see also Caldwell v. United States, 595 A. 2d 961, 964-966 (D. C. 1991). Significantly, some courts have found no bar to the imposition of a prison sentence for contempt even where the court order that was transgressed was an injunction against violation of a statute that itself did not provide for imprisonment as a penalty. See, e. g., United States v. Quade, 563 F. 2d 375, 379 (CA8 1977), cert. denied, 434 U. S. 1064 (1978); Mitchell v. Fiore, 470 F. 2d 1149, 1154 (CA3 1972), cert. denied, 411 U. S. 938 (1973); United States v. Fidanian, 465 F. 2d 755, 757-758 (CA5), cert. denied, 409 U. S. 1044 (1972).

 That the contempt proceeding was brought and prosecuted by a private party in Foster is immaterial. For “[p]rivate attorneys appointed to prosecute a criminal contempt action represent the United States, not the party that is the beneficiary of the court order allegedly violated. As we said in Gompers, criminal contempt proceedings arising out of civil litigation ‘are between the public and the defendant. . . .’ 221 U. S., at 445.” Young v. United States ex rel. Vuitton et Fils S. A., 481 U. S. 787, 804 (1987).

 Like Justice Scalia, I take no position as to the application of the Double Jeopardy Clause to conduct warranting summary contempt proceedings. See ante, at 697, n. 1. In different circumstances, the Court has recognized exceptions to the policy of avoiding multiple trials where ‘“there is a manifest necessity.’” United States v. Wilson, 420 U. S. 332, 344 (1975) (quoting United States v. Perez, 9 Wheat. 579, 580 (1824)).

 The laws of different jurisdictions make such alternatives more or less available but that, of course, can have no bearing on the constitutional requirements we recognize today. In the District of Columbia, D. C. Code Ann. § 23-1329 (1989) contemplates both revocation of release and an order of detention in the event a condition of release has been violated. Also, *732 trial court judges possess the authority to modify pretrial bail. See D. C. Code Ann. § 23 — 1321(f) (1989); Clotterbuck v. United States, 459 A. 2d 134 (D. C. 1983). Federal provisions are similar. Thus, 18 U. S. C. § 3148(a) provides that “[a] person who has been released [pending trial], and who has violated a condition of his release, is subject to a revocation of release, an order of detention, and a prosecution for contempt of court.”

 In response, amici emphasize that many motions are brought by women who proceed pro se and are not familiar with the minutiae of double jeopardy law. Brief for Ayuda et al. as Amici Curiae 26. The point is well taken. But the problem should be addressed by such means as adequately informing pro se litigants, not by disregarding the Double Jeopardy Clause.
*735 In re Nielsen, 131 U. S. 176, 187 (1889), the offense of criminal threat defined in § 22-2307. Therefore, for reasons explained below, prosecution for one should preclude subsequent prosecution for the other.

 Justice Scalia disputes this description of the Civil Protection Order (CPO). He questions whether the word “ ‘assault’ ” meant “ ‘assault under § 22-504,’ ” ante, at 700, n. 3, but defers to the contempt court’s interpretation, and notes that the parties have not challenged this point. Ibid. He also disagrees that the reference to “threats” was to threats “that violate the District’s criminal laws.” Ante, at 702-703, n. 8. Indeed, given the context — a “domestic situation” — he finds this construction “highly artificial.” Ibid. But that, too, is how the court applying the court order appears to have understood it. Responding to the very argument made here by Justice Scalia — namely that the “context of domestic violence” somehow stretched the meaning of “threat,” Tr. in Nos. IF-630-87, IF-631-87 (Aug. 8, 1988), p. 315 — the court asserted that “in a criminal case, the defendant is entitled to more specific notice of the nature of the charge.” Id., at 316. Significantly, in acquitting Foster with respect to the threat allegedly made on November 12, 1987, the court stated that it was “not satisfied if those words as such, in spite of the context of this dispute, constitutes a legal threat.” Ibid, (emphasis added). For the same reason that the court concluded that the word “assault” referred to the District’s criminal provisions, it decided that the CPO’s reference to “threats” was to “legal” threats — i. e., threats as defined by the law. Moreover, I note that the Government’s presentation of this case coincides with this view. See Brief for United States 26 (describing the order not to “assault or in any manner threaten” as “directing] Foster ... to refrain from engaging in criminal conduct”).
In any event, even assuming that the prohibition in the court order referred to threats other than those already outlawed, that should not change the outcome of this case. The offense prohibited in the CPO — to threaten “in any manner” — at the very least is “an incident and part of,”

 Therefore, I obviously disagree with The Chief Justice’s Block-burger analysis which would require overruling not only Grady v. Corbin, 495 U. S. 508 (1990), but, as Justice Scalia explains, Harris v. Oklahoma, 433 U. S. 682 (1977), as well. See ante, at 698. At the very least, where conviction of the crime of contempt cannot be had without conviction of a statutory crime forbidden by court order, the Double Jeopardy Clause bars prosecution for the latter after acquittal or conviction of the former.

 Similar results follow, of course, from The Chief Justice’s interpretation of the Clause.

 Justice Scalia’s dismissal of this concern is difficult to follow. As I understand it, he maintains that no double jeopardy problem exists because under Blockburger a conviction for assault would not be upheld. See ante, at 702, n. 7. I suppose that the judge could upon request instruct the jury on the lesser included offense and await its verdict; if it were to find Foster guilty of simple assault, the court could then vacate the conviction as violative of the Double Jeopardy Clause — or, barring that, Foster could appeal his conviction on that basis. The sheer oddity of this scenario aside, it falls short of providing Foster with the full constitutional protection to which he is entitled. A double jeopardy violation occurs at the inception of trial, which is why an order denying a motion to dismiss on double jeopardy grounds is immediately appealable. See Abney v. United States, 431 U. S. 651 (1977). As we explained in that case: “[T]he Double Jeopardy Clause protects an individual against more than being subjected to double punishments. It is a guarantee against being twice put to trial for the same offense.” Id., at 660-661. In light of the lesser included offense instructions, and the associated risk of conviction for that offense, Foster would have to defend himself in his second trial once more against the charge of simple assault, thereby undergoing the “personal strain, public embarrassment, and expense of a criminal trial.” Id., at 661. Even if the conviction were set aside, he still would have “been forced to endure a trial that the Double Jeopardy Clause was designed to prohibit.” Id., at 662. Indeed, I would have imagined that Justice Scalia would agree. As he recently wrote: “Since the Double Jeopardy Clause protects the defendant from being ‘twice put in jeopardy,’ i. e., made to stand trial ... for the ‘same offence,’ it presupposes that sameness can be determined before the second trial. Otherwise, the Clause would have prohibited a second ‘conviction’ or ‘sentence’ for the same offense.” Grady, 495 U. S., at 529 (dissenting opinion) (emphasis added). This double jeopardy predicament, of course, could be avoided by Foster’s attorney not requesting the lesser included offense instructions to *741 which his client is entitled. But to place a defendant before such a choice hardly strikes me as a satisfactory resolution.